## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

CORNELIEO PEREZ,                    )
                                    )
                    Plaintiff,      )
                                    )
v.                                  )          No. 4: 21 CV 557 DDN
                                    )
KILOLO KIJAKAZI,                    )
Acting Commissioner of Social Security,   )
                                    )
                    Defendant.      )

## MEMORANDUM

This action is before the Court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Cornelieo Perez for disability insurance benefits (DIB) under Title II of the Social Security Act (Act). The parties have consented to the exercise of plenary authority by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the final decision of the Commissioner is affirmed.

## I  BACKGROUND

Plaintiff was born in 1970 and protectively filed his application for DIB on September 3, 2015. (Tr. 140-41.) He alleged disability due to depression, hyperventilation syndrome, sleep deprivation syndrome, and severe anxiety. (Tr. 179.) His claims were denied, and he requested a hearing before an administrative law judge (ALJ). (Tr. 84-85.)

On January 12, 2017, following a hearing, the ALJ concluded that plaintiff was not disabled under the Act. (Tr. 1, 19-27.) The Appeals Council denied review. Accordingly, the ALJ's decision became the final decision of the Commissioner subject to judicial review by this Court under 42 U.S.C. § 405(g). (Tr. 1-6.)

## II.  ADMINISTRATIVE RECORD

The following is a summary of plaintiff's medical and other history relevant to his appeal.

On February 24, 2014, plaintiff underwent a psychology intake with VA staff psychologist Shawn O'Connor, Ph.D. to reengage services.  His current complaints were sleep problems, anger, and anxiety.  He reported numerous ongoing struggles with PTSD related symptoms that he had become less effective at managing over the past year.  He experienced frequent intrusive thoughts; his mind would wander to stressful events from deployment, which triggered anxiety, anger, and muscle tension at his job.  He reported thinking "anything can happen" and that he felt overwhelmed.  He reported that he preferred to be up and moving rather than being a "sitting duck" at work.  He had nightmares, for example, being trapped underwater in a car.  His mood and temper negatively affected his relationships.  He had a short temper and felt anxious.  He became tearful easily, avoided social situations, and felt comfortable only at home in his "fortress."  He had persistent irritability and snapped at others.  He avoided having friends/family over and stayed in contact only with fellow service members.  He would wake to any noise and had difficulty falling back to sleep.  He was scheduled for a psychiatric evaluation.  (Tr. 385-88, 554-56.)

On March 10, 2014, plaintiff underwent a psychiatric evaluation with Klara I. Curtis, M.D. at the VA.  Plaintiff complained of increased difficulty with anxiety and lack of patience.  He had experienced persistently heightened anxiety since returning from his first tour in 2003.  He rated his anxiety 8/10 most of the time, with crowds and noises leading to further peaks.  He felt overwhelmed and restless when anxious.  He rated his mood 3-4/10 and reported it had been chronically low for several years.  He had decreased interest in activities, social withdrawal, and interacted only with his spouse and two military friends.  He had missed work several times over the past several months which was not typical.  He had pervasive irritability and felt annoyed and angry 50% of the time.  He had a variable appetite, disrupted sleep with initial insomnia, and multiple awakenings

- 2 -

triggered by nightmares, as well as noises and need to use the bathroom.   He was chronically fatigued during the day.   He had nightmares about combat 2-3 times per week and periodic intrusive recollections.   He had marked hypervigilance, often questioned the purpose of his life, and described a sense of worthlessness.   On exam he was anxious, tearful, and had a constricted affect, low mood, and fair insight.   His GAF score was 55, indicating moderate symptoms.   His diagnoses included Depressive Disorder, not otherwise specified, and PTSD with dysphoria, irritability, anxiety symptoms, hypervigilance, sleep disruption, and hopelessness.   He was referred to a stress management class and prescribed Zoloft, an antidepressant.  (Tr. 376-79.)

On April 21, 2014, psychiatric records from the VA indicate plaintiff had an excellent mood since starting Zoloft, with ongoing irritability although he could "talk himself down" now.   He was working on how to manage or de-escalate anger.   His anxiety level was variable but 7/10 most of the time with chronic hypervigilance.   Prazosin, used to prevent increased anxiety, did not provide any clear improvement in his nightmares.   On exam he had a mildly anxious and constricted affect or perceived emotion and fair insight. His GAF score was 55.   His Zoloft dosage was increased.  (Tr. 369-73.)

On June 9, 2014, Plaintiff saw psychiatrist Jay L. Liss, M.D.   Dr. Liss completed a VA form titled "Review Post Traumatic Stress Disorder (PTSD) Disability Benefits Questionnaire."   Dr. Liss reported diagnoses of PTSD due to combat in Iraq and Afghanistan.   He reported additional diagnoses of anxiety with flashbacks and depression associated with PTSD.   Plaintiff's Axis IV problems, psychosocial and environmental, included divorce, isolation, and aggressiveness.   His GAF score was 35, indicating serious impairment.  (Tr. 234-35.)

Dr. Liss reviewed plaintiff's VA records and history.   Dr. Liss identified PTSD diagnostic criteria as follows.   Veteran (Vet) was exposed to a traumatic event where he experiences or witnessed or was confronted with an event that involved actual or threatened death or serious injury, or threat to the physical integrity of self or others, and that the traumatic event is re-experienced in the following ways: recurrent and distressing dreams

and recollections of the event, including images, thoughts or perceptions, acting or feeling as if the event were reoccurring, including the sense of reliving the experience, delusions, hallucinations and dissociative flashback episodes, including those that occur on awakening or when intoxicated and intense psychological distress at exposure to internal or external cues that are symbolic or resemble an aspect of the traumatic event.  (Tr. 237.)

Dr. Liss identified criterion C, persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness, as indicated by the following: efforts to avoid thoughts, feelings or conversations associated with the trauma, efforts to avoid activities, places or people that arouse recollections of the trauma, inability to recall an important aspect of the trauma, markedly diminished interest or participation in significant activities, feeling of detachment or estrangement from others, restricted range of affection and sense of a shortened future.  (Tr. 237.)

Dr. Liss identified Criterion D, persistent symptoms of increased arousal, not present before the trauma were identified as: difficulty falling/staying asleep, irritability or anger outbursts, difficulty concentrating, hypervigilance, and exaggerated startle response. Dr. Liss noted plaintiff's symptoms caused clinically significant distress or impairment in social, occupational, or other important areas of functioning.  Dr. Liss identified plaintiff's current symptoms to include: depressed mood, anxiety, suspiciousness, panic attacks and flashbacks more than once a week, chronic sleep impairment, mild memory loss, impairment in short and long term memory, memory loss for names of close relatives, own occupation or own name, flattened affect, disturbances of motivation and mood, difficulty establishing and maintaining effective work and social relationships, difficulty adapting to stressful circumstances, including work or work like setting, inability to establish and maintain effective relationships, suicidal ideation and persistent delusions, hallucinations or flashbacks.  (Tr. 237.)

On July 28, 2014, plaintiff was seen for psychiatry follow-up at the VA.  He reported improvement after increasing Zoloft until recent stressors at work led to an overall worsening once again.  His mood was down the last few weeks due to stress.  He was

preoccupied with a recent work situation regarding his hours, and he is being forced to leave his job.  His appetite was decreased.  His sleep was disrupted and had worsened recently with frequent waking and combat-related nightmares 1-2 times per week.  A mental status exam revealed down mood, upset, angry and constricted affect, and fair insight.  His GAF score was 55.  (Tr. 363-68.)

On August 28, 2014, plaintiff was seen at the VA for a psychiatric appointment.  He complained of ongoing stress related to his job situation and described his mood by stating "I've seen better days."  He had increased irritability with frequent escalation to shouting and increased conflict and argument with his wife over finances.  He had decreased interest in activities and appetite, disrupted sleep, and difficulty getting out of bed in the mornings.  He had decreased eye contact and a dysphoric (sad), irritable, and constricted affect. His speech increased in amount as he became focused on his job situation.  His thought process was preoccupied with his job situation and insight was fair.  His GAF score was 55.  He was diagnosed with depressive disorder, not otherwise specified, with worsening mood, increased irritability, and decreased interest, appetite, and sleep.  His Zoloft was increased, and Prazosin continued.  (Tr. 356-61.)

On September 12, 2014, plaintiff was seen in the ER at Mercy Hospital after becoming short of breath while driving to a job interview.  He reported having tingling in his hands that moved into his face, neck and legs associated with lightheadedness with feelings of impending doom.  He pulled off the road and called EMS.  He was diagnosed with classic hyperventilation syndrome, which improved after paramedics arrived.  He was asymptomatic in the ER and released.  (Tr. 241-45.)

On September 16, 2014, plaintiff reported to the VA he had experienced the same symptoms of anxiety as on September 12 although they subsided.  He requested talk therapy and was eager to see a psychologist.  (Tr. 554-56.)

On October 9, 2014, plaintiff was seen at the VA.  He reported ongoing employment related stress.  He had increased anxiety, as well as a panic attack.  He reported some irritability, decreased appetite, disrupted sleep pattern with frequent awakenings and

- 5 -

difficulty falling asleep at night, as well as some dreams with a military background.  A mental status exam revealed constricted affect and fair insight.  He reported being "happy to at least have a job."  His GAF score was 55.  Assessment indicated depressive disorder with worsening symptoms in the context of current stressors, with two panic-like attacks since the last visit.  A trial of Trazadone was recommended.  He was diagnosed with PTSD with dysphoria, irritability, anxiety symptoms, hypervigilance, and sleep disruption.  (Tr. 341-44.)   Plaintiff completed A Posttraumatic Stress Disorder Checklist (PCL-C), a standardized self-report measure of symptoms of PTSD, and scored 61, indicating he was positive for PTSD.  (Tr. 345-46.)

On November 12, 2014, plaintiff saw Dr. Curtis, reporting that he quit his new job because he was unable to tolerate the situation.  He was frustrated, upset, irritable, agitated, anxious, and hypervigilant.  He had experienced another panic attack since the last visit but reported some easing of the anxiety since quitting the job.  His appetite was decreased, and sleep disrupted.  Trazadone was not helpful.  His affect or mood was intermittently angry, and his insight was fair.  His GAF score was 55. He was diagnosed with depressive disorder, worsening symptoms.  His Trazadone was increased,  and Vistaril, for anxiety, was prescribed.   (Tr. 604-607.)

On January 6, 2015, plaintiff saw Dr. Curtis.  He completed another PCL-C test and scored 66.  He reported to Dr. Curtis he was no longer seeking employment and was frustrated with the problems he saw in the civilian community related to work ethic.  He rated his mood between 3-5/10 and reported he was more withdrawn recently.   He had heightened irritability, was easily frustrated, and his anxiety level remained elevated.  His sleep was fair, but he reported difficulty sustaining sleep.  His GAF score was 55.  He complained of a worsening mood, social withdrawal, ongoing irritability, and anxiety, despite resolution of his employment related stressors.   His Zoloft was increased to improve his mood symptoms.  (Tr. 607-14.)

On March 6, 2015, plaintiff saw Dr. Curtis.  He had stopped taking Zoloft because he thought the higher dose led to more frequent panic attacks.  His anxiety level was rated

8/10 most of the time exacerbated by "thinking too much" every few days.  He described his mood as "not too bad" and said he was feeling less irritable.  He had recently started attending church and exercising regularly.  His sleep was disrupted by terminal insomnia, and he was awakened by noises and unable to return to sleep.  He had started seeing a second psychiatrist in the community and was receiving medications for anxiety.  Dr. Curtis told him he needed to select and continue care with only one psychiatrist.  (Tr. 615-19.)

Around April 14, 2015, plaintiff's wife applied to the Family Caregiver program and reported the following.  Plaintiff cannot drive, cannot be left alone, and will not go anywhere without her.  He needs to go everywhere with her which is difficult considering his discomfort in crowds.  He sits in the bedroom in the dark if left alone.  She helps him with medications, supervises his kitchen tasks, and reminds him about personal care.  He has nightmares that interrupt both of their sleep. She has too many responsibilities with him and their daughter to maintain employment.   Plaintiff was frequently absent at prior jobs due to sleeping, anxiety, and panic attacks.  Plaintiff felt his PTSD was out of control. (Tr. 621-22.)

On May 13, 2015, plaintiff saw psychiatrist Jane Loitman, M.D., a new provider. He stated he was struggling with depression, energy, irritability, tearfulness, and difficulty getting up in the morning, showering, and engaging.  Dr. Loitman prescribed Escitalopram, an antidepressant.  (Tr. 635-69.)

During a June 10, 2015 visit with Dr. Loitman plaintiff revealed a euthymic mood (without a mood disorder) and congruent affect, which was full range and appropriately tearful.  He discussed a dream he connected to the military where he was being stabbed. (Tr. 642-45.)

On June 12, 2015, plaintiff underwent an Occupational Therapy Evaluation after he reported a lack of motivation to get out of bed and preference to stay in bed away from the outside world.  He found it difficult to be alone.  He did not feel focused.  He was unsure if he had memory issues, and reported his wife keeps him on track with appointments and

medications.  As to activities of daily living, he can follow directions for microwave meals but has forgotten food left on the stove.  His wife manages their money.  When he buys things, he does not pay attention to the change.  At their home, his wife does the inside work, and he does the outside work.  He is seldom left alone to care for their daughter.  He does not like driving.  He was accustomed to looking out for dangerous things on the roadside, such as bags, rocks, etc., but finds this stressful now.  He misses exits from time to time.  He wants to work but his anxiety is a barrier.  He scored 23/30, slightly below normal, on the Montreal Cognitive Assessment, a cognitive screening test designed to assist in detecting mild cognitive impairment and Alzheimer's disease.  He had mild cognitive dysfunction with errors, largely in sentence repetition, fluency, abstraction, and memory/delayed recall.  (Tr. 464-66.)

In a function report dated November 12, 2015, plaintiff reported the following.  He has difficulty staying focused.  He has panic attacks, flashbacks, nightmares, insomnia, and anger outbursts.  He has fatigue and falls asleep when trying to complete tasks.  His wife reminds him of daily functions.  He gives the dog food and water with the help of his wife.  He needs reminders to bathe, get ready to leave the house, and dress.  His wife helps him remember medications.  He sometimes forgets to turn off the stove and gets fatigued. As to housework, he takes care of the trash and cuts the grass occasionally.  His wife reminds him of these activities.  He can drive but prefers to have someone with him because he has had panic attacks while driving in the past and needed to pull over to the side of the road.  He does not shop and is unable to manage a savings account or checkbook.  His wife manages their finances.  He has difficulty remembering what money he spent.  He formerly enjoyed assembling models as a hobby, but it now takes him a while due to his lack of focus and inability to complete tasks in general.  He attends church twice a week and sometimes needs reminders about the day of the week.  He does not feel comfortable socializing and does not trust people.  Attending church is his only social activity.  He has difficulty following instructions and getting along with others.  His ability to pay attention varies from day-to-day and he sometimes needs repeated instructions.  He does not handle

stress well.  He "shuts down" and shuts people out.  He does not handle change in routine well.  He likes things to be in order or it affects his mood.  He sometimes has feelings of flashbacks or attacks when outside.  (Tr. 199-205.)

On January 15, 2016, state agency psychologist consultant Charles W. Watson, Psy.D. reviewed plaintiff's file at the initial level.  He opined that plaintiff was moderately limited in his ability to: understand, carry out and remember detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, interact appropriately with the general public, get along with coworkers or peers without distracting them or exhibiting behavioral extremes and respond appropriately to changes in the work setting and set realistic goals or make plans independently of others.  Dr. Watson concluded plaintiff retained the ability to understand, remember and execute simple work instructions, could work with others on a limited contact basis, and appeared  to have the capacity to adapt to simple work environments.

Dr. Watson reviewed a statement from Dr. Liss from plaintiff's file and concluded the opinion was out of date, not supported with his own notes, which he described as sparse and contradictory, and provided an opinion reserved to the Commissioner.  Dr. Watson noted it was dated during the previous Psychiatric Review Technique Form review, and therefore addressed it but gave it no weight.  (Tr. 72-74.)

On August 26, 2016, Dr. Liss authored a Mental Residual Functional Capacity (RFC) Questionnaire.  He reported treating plaintiff between June 2014 through July 27, 2015.  He diagnosed PTSD and indicated plaintiff's PTSD was chronic and progressive, and while there was no defined treatment defined, psychotherapy was his current treatment. He identified the following signs and symptoms: anhedonia or pervasive loss of interest in almost all activities; thoughts of suicide; feelings of guilt or worthlessness; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; psychomotor agitation or retardation; persistent disturbances of mood or affect; change in

- 9 -

personality; paranoid thinking or inappropriate suspiciousness; emotional withdrawal or isolation; psychological or behavioral abnormalities associated with a dysfunction of the brain with a specific organic factor judged to be etiologically related to the abnormal mental state and loss of functional abilities; and persistent irrational fear of a specific object, activity or situation which results in a compelling desire to avoid the dreaded object, activity or situation. Dr. Liss also referred to a checklist of symptoms he identified from his previous June 2014 opinion. He opined plaintiff was unable to meet competitive standards in all areas of the mental abilities and aptitudes needed for unskilled work due to his symptoms. He opined plaintiff would miss more than 4 days of work per month because of his impairments or treatment and his symptoms were reasonably consistent with the symptoms and functional limitations described in the evaluation. (Tr. 711-15.)

On November 1, 2016, following a hearing and at the request of the ALJ, plaintiff underwent a psychological evaluation with Michael T. Armour, Ph.D. (Tr. 729-41.) Dr. Armour performed a clinical interview, Trails A and B testing, Wechsler Memory Scale IV, Wechsler Adult Intelligence Scale IV, and reviewed records from the Department of Social Services. Plaintiff reported serving in the Army for 20 years with his highest rank as an E6, which was staff Sergeant, and he received an honorable discharge after three tours in Iraq and one in Afghanistan. He reported he was in combat and saw others get wounded or killed. He reported bad dreams or nightmares about past combat experiences 2-3 times per week, but it can happen more frequently. He had unwanted intrusive thoughts of past abuse and he must avoid at times stimuli or reminders of the abuse. He had flashbacks reliving combat experiences about twice a week. He reported having some disagreements with coworkers at jobs after leaving the military. He reported using the VA for psychiatric treatment in the past but stopped as he felt more upset when he left the VA, so he started seeing Dr. Liss in private practice. (Tr. 729-32.)

Plaintiff underwent the Trail Making Test (TMT), a timed, neuropsychological test that involves visual scanning and working memory. It revealed plaintiff was functioning in the upper end of the impaired range on Trails A testing, a visual sequencing activity, and

- 10 -

in the impaired range on Trails B, a more complex visual sequencing task, which required him to alternate between sequences of numbers and letters.  His performance indicated he can perform visual sequencing tasks but at times gets "lost" in scanning his visual environment.  (Tr. 732.)

On the Wechsler Memory Scale, a neuropsychological test designed to measure different memory functions, plaintiff performed in the low average range for auditory, immediate, and delayed memory.  He was in the 9th percentile in auditory memory, 13th percentile in immediate memory, and 18th percentile in delayed memory.  Plaintiff was in the average range on visual and visual working memory.  IQ testing revealed a Verbal Comprehension Score of 89, in the 23rd percentile, or low average.  In Perceptual Reasoning he scored 88, in the 21st percentile and low average.  His working memory index score was 95, in the 37th percentile, and average.  His Processing Speed score was 86, in the 18th percentile, or low average range.  His Full-Scale IQ score was 86, the low average range and in the 18th percentile.  Dr. Armour believed this was a mild underestimation of his actual level of cognitive functioning.  Plaintiff fell in the low average range on task assessing, general, nonverbal problem-solving skills and on measures of his processing speed on timed tasks and on coding tasks.  (Tr. 732-33.)

Plaintiff's mental status exam revealed plaintiff as somewhat formal.  His mood during the evaluation session was more somber and he reported ongoing problems with depression and anxiety.  His affect or perceived emotion was limited in range in that he did not show much emotional expression or variation during the interview but the emotion he showed was appropriate to the emotional tone of the subjects discussed and to his self-report of his mood.  He reported flashbacks twice a week and an "off and on" sleep pattern reporting it is worse when he has nightmare.  He reported an "up and down" appetite and energy level and reported having stayed in bed all day one day the previous week.  He reported excessive energy when he was in the military in combat situations and that he still had racing thoughts 3-4 times per week.  He described his mood as generally anxious and that he engages in "negative anticipation."  He reported episodes of being depressed and

- 11 -

withdrawn which can last for a day or two at a time.  He has crying spells 2-3 times per week and can choke up over thoughts of suicide.  Dr. Armour diagnosed PTSD, recurrent moderate major depressive disorder, generalized anxiety disorder, panic disorder, and alcohol use disorder by history.  (Tr. 733-35.)

   Dr. Armour opined plaintiff had mild impairment in his ability to understand and recall instructions, as he did not show symptoms of attention or focusing difficulty.  He had moderate to at times severe impairment in his ability to concentrate and persist in tasks.  Armour opined plaintiff had a severe impairment in his ability to interact socially and adapt to his environment, reporting difficulty with interacting with others, feeling depressed and anxious, and that he did not fit in or "mesh" with others.  Armour noted plaintiff reported he can do basic daily tasks but has ongoing problems with anxiety and depression and will isolate himself and stay in bed all day due to depression and anxiety.  (Tr. 735-36.)

## ALJ HEARING

On October 4, 2018, plaintiff appeared and testified to the following at a hearing before an ALJ.  (Tr. 32-62.)  He has a twelfth-grade education.  He is retired since 2011 and 20 years in the Army as a petroleum handler.  He worked at UPS as a package handler from February to July 2012.  He has worked in security at Blackwell Security Services, Andy's Frame Services, and Whelan Security.   He left Whelan Security where he was an armed security guard at the St. Louis Amtrak station after having panic attacks about the imminent danger the job presented.  (Tr. 38-47, 49.)

During a typical day he gets up and helps his wife get their five-year-old daughter ready for school, as well as feeds the dogs.  He reads or does other things, such as lawn work, to occupy himself during the day.  He tends to forget a lot of things.  He attends church regularly.  (Tr. 47-51.)

He stays to himself a lot now and his trust level is very low.  He prefers to be by himself.  He has some hostility towards others.  He has panic attacks lasting two to five minutes and which occur about two or three times per week.  He has brief crying spells

- 12 -

about two or three times per week.  He has nightmares about four times per week and is hypervigilant while out shopping, for example.  His home is his "safe haven." (Tr. 51-55.)

A vocational expert also testified to the following.  Plaintiff's past relevant work is identified as petroleum supply specialist for the military, which is semi-skilled, and transfers to DOT distribution supervisor.  He also has past relevant work as a security guard and hand packager.  The vocational expert testified plaintiff would be unable to perform his past relevant work.

The ALJ asked the vocational expert about a hypothetical individual with what would later become plaintiff's residual functional capacity.  The vocational expert testified that there was other work that existed in the national economy that such an individual could perform, including document preparer, linen supply load builder, and laundry worker.  (Tr. 59-62.)

## DECISION OF THE ALJ

On January 12, 2017, the ALJ issued a decision finding that plaintiff was not disabled.  (Tr. 1, 19-27.)[1]  At Step One, the ALJ found that plaintiff had not engaged in substantial gainful activity since November 1, 2014, his alleged onset date.  (Tr. 21.)  At Steps Two and Three, the ALJ found that plaintiff had the severe impairment of post-traumatic stress disorder with panic attacks, but that this impairment did not meet or medically equal a listed, presumptively disabling impairment prior to December 31, 2019, his date last insured.  (Tr. 21.)

For purposes of the final two steps, the ALJ found that plaintiff had the residual functional capacity (RFC) of a full range of work at all exertional levels but with the following nonexertional limitations: avoid all exposure to operational control of moving machinery and unprotected heights; work is limited to performing simple, routine repetitive

---

[1] The ALJ's decision is undated but was issued January 12, 2017, as noted elsewhere in the record.

tasks in a work environment free of fast paced production requirements, although end of day quotas are acceptable, and simple work-related decisions with few, if any, workplace changes; job responsibilities that do not require public interaction, only casual and infrequent interaction with co-workers with no tandem tasks, and occasional interaction with supervisors.  (Tr. 22-23.)

At Step Four, with vocational expert testimony, the ALJ found that plaintiff was unable to perform his past relevant work as a distribution supervisor, a security guard, and a hand packager.  However, at Step Five, the ALJ found there were other jobs that existed in the national economy that plaintiff could perform, such as document preparer, linen supply load builder, and laundry worker.  The ALJ therefore concluded that plaintiff was not disabled under the Act.  (Tr. 26-27.)

## **GENERAL LEGAL PRINCIPLES**

In reviewing the Commissioner's denial of an application for disability insurance benefits, the Court determines whether the decision complies with the relevant legal requirements and is supported by substantial evidence in the record.  *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009).  Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).  The review considers not only the record for the existence of substantial evidence in support of the Commissioner's decision. It also considers whatever in the record fairly detracts from that decision.  *Cox v. Apfel,* 160 F.3d 1203, 1207 (8th Cir. 1998). This Court may not reverse the Commissioner's decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because the Court would have decided the case differently.  *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D), (d)(1)(A); *Pate-Fires*, 564 F.3d at 942.   A five-step regulatory framework is used to determine whether an individual is disabled.  20 C.F.R. § 404.1520(a)(4); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987) (describing five-step process); *Pates-Fires*, 564 F.3d at 942.

Steps One through Three require the claimant to prove: (1) he is not currently engaged in substantial gainful activity; (2) he suffers from a severe impairment; and (3) his condition meets or equals a listed, presumptively disabling impairment.  20 C.F.R. § 404.1520(a)(4)(i)-(iii).   If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.   Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW).  *Id.* § 404.1520(a)(4)(iv).  The claimant bears the burden of demonstrating he is no longer able to do so.   *Pate-Fires*, 564 F.3d at 942.   If the Commissioner determines the claimant cannot return to his PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy.   *Id.*; 20 C.F.R. § 404.1520(a)(4)(v).

### III.  DISCUSSION

Plaintiff asserts the ALJ erred in (1) evaluating the medical opinion evidence; and and (2) assessing his credibility.   The Court disagrees.

**Medical Opinion Evidence**

**Consulting Psychologist Michael Armour, Ph.D.**

Plaintiff argues the ALJ erred in giving psychologist Dr. Armour's opinion only "partial" weight.  He notes the ALJ did not consider or discuss the extent to which Dr. Armour reviewed the evidence or the extent of his evaluation.  He complains the ALJ adopted Dr. Armour's opinion that plaintiff was markedly limited in concentration,

persistence, and pace, but did not give any weight to his opinion that plaintiff had severe limitations in social functioning and adapting and managing.  He complains the decision contains no discussion regarding why only one part of the opinion was accepted while the other parts were not.  He notes that while Dr. Watson's opinion was not discounted despite conducting no examination, it makes little sense that Dr. Armour's opinion was discounted for this reason.  He contends that if Dr. Armour's opinion was not entitled to greater weight because he only conducted one exam, Dr. Watson's opinion was entitled to even less weight, as a non-examining physician who reviewed only part of the record and did not see the results of Dr. Armour's exam or testing.

Plaintiff further notes that Dr. Armour was the last person to review the record evidence and conduct an exam and testing.  He argues that if the ALJ had afforded great weight to Dr. Armour's opinion, as an examining source, plaintiff would have been found incapable of performing any type of work.  He notes that Dr. Armour found plaintiff had severe impairments in social functioning, concentration, persistence and pace and adapting and managing oneself.  He argues the decision contains no rationale as to why Dr. Watson's opinion was entitled to more weight than Dr. Armour's.  He argues that while a  rationale was given, it was not accurate, so the decision contains no legitimate reason for finding Watson's opinion more persuasive.

**State Agency Consultant Charles W. Watson, Psy.D.**

Plaintiff argues the ALJ erred in giving "great" weight to state agency consultant Dr. Charles Watson's January 15, 2016 opinion from the initial level.  He notes the ALJ gave three reasons for affording great weight to Dr. Watson's opinion, i.e., that it was based on a review of the evaluation of Dr. Armour and on a review of the entire record available at the time, and Dr. Watson has expertise and familiarity with SSA program rules.  Plaintiff points out that Dr. Watson, a non-examining physician, did not review Dr. Armour's evaluation because it did not exist until November 2016, well after Dr. Watson issued his opinion.  He notes the ALJ misstates the date of Dr. Armour's evaluation as November 1, 2015, rather than November 1, 2016.  He further notes Dr. Watson did not review the entire

- 16 -

file, including Dr. Armour's evaluation and the 2016 opinion from Dr. Liss.  He contends the fact that Dr. Watson reviewed some record evidence before issuing his opinion and his familiarity with the SSA program rules is insufficient to warrant giving his opinion great weight.

Plaintiff also complains that although the ALJ gave "great weight" to Dr. Watson's opinion, he failed to consider all the limitations in the opinion.  He notes that while the ALJ found a marked impairment in concentration, persistence and pace, he failed to explain why he did not adopt Dr. Watson's opinion regarding plaintiff being only moderately limited in concentration, persistence and pace.  Therefore, he argues that if Dr. Watson's opinion is entitled to "great weight," then the ALJ was obligated to find plaintiff had only moderate limitations in concentration, persistence, and pace.  He argues that if the ALJ rejected this part of the opinion, he was obligated to explain the basis therefor.  He asserts this is a material inconsistency that the ALJ failed to address.

**Treating Psychiatrist Jay L. Liss, M.D.**

Plaintiff next argues the ALJ erred in giving only "little" weight to the opinion of treating psychiatrist Dr. Jay Liss.  Plaintiff argues he saw Dr. Liss on eight occasions, every four months from 2014 through 2016, at the same time he was also seeing a VA psychiatrist.  He argues the ALJ's reasoning that his visits were brief is inaccurate because the records contain no information as to the length  of the visits.  He also argues the ALJ failed to explain how or why the frequency of his visits is inconsistent with Dr. Liss's opinion.  Plaintiff notes that Dr. Liss noted PTSD is progressive and persistent and there is no defined treatment, which is not inconsistent with the frequency of visits.  He argues the record as a whole provides a basis for Dr. Liss's opinion, specifically, Dr. Liss indicated he reviewed the VA records, provided a great deal of information about his background, identified the PTSD criteria, documented his diagnosis of PTSD, and prescribed medication.  He takes issue with the ALJ's notion that Dr. Liss never recommended intensive outpatient therapy or hospitalization, as there is no indication that this is the

appropriate treatment for his condition.  Finally, he argues the only evidence that is inconsistent with Dr. Liss's opinion is that of Dr. Watson.

Plaintiff applied for benefits before March 27, 2017, and the ALJ properly applied the set of regulations for evaluating medical opinion evidence for this period.  It is the ALJ's responsibility to weigh conflicting evidence and to resolve disagreements among physicians.  *See Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014).  A treating physician's opinion controls if it is well supported by medically acceptable diagnostic techniques and is not inconsistent with the other substantial evidence.  *Prosch v. Astrue*, 201 F.3d 1010, 1012-13 (8th Cir. 2012).  While treating physician opinions typically receive more weight than opinions from one-time examiners, a treating physician's opinion may be disregarded in favor of other opinions if it does not find support in the record.  *See* 20 C.F.R. § 404.1527(c)(1)-(2); *See Casey v. Astrue*, 503 F.3d 687, 692 (8th Cir. 2007). The regulations require that the ALJ "always give good reasons" for the weight afforded to a treating physician's evaluation.  *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2))."  Unless a treating source's opinion is given controlling weight, the ALJ's decision must explain the weight given to the opinions of a state agency medical consultant or other program physician.  In the narrative discussion section of the decision, the ALJ "must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  SSR 96-8p, 1996 WL 374184, at *7.

However, an ALJ is not required to adopt all the limitations of any medical opinion. *See Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (ALJ does not need to adopt the entirety of a medical opinion); *Fischer v. Colvin*, No. 2:14 CV 104 ACL, 2016 WL 1170972, at *7 (E.D. Mo. Mar. 25, 2016) (although the ALJ assigned "great weight" to a medical opinion, the ALJ was not obligated to adopt every limitation contained therein).

The ALJ first evaluated the November 1, 2016[2] medical opinion of consultative examiner Dr. Armour ordered by the ALJ following plaintiff's October 2016 administrative hearing.  (Tr. 24.)  Dr. Armour based his findings on an interview, psychological examination, an IQ test, and other objective cognitive testing.  Dr. Armour assessed mild impairment in the ability to understand and recall instructions, observing that plaintiff demonstrated low-average to average cognitive and memory skills, with no difficulty understanding and applying different formal assessment instructions.  He found a moderate, and at times severe, impairment in the ability to sustain concentration and persistence in tasks, citing plaintiff's reported symptoms of PTSD, depression, and anxiety. Additionally, Dr. Armour assessed a severe impairment in the ability to interact socially and adapt to the environment, citing plaintiff's reported symptoms of PTSD, anxiety, and depression.  (Tr. 735).

The ALJ gave deference to Dr. Armour's medical expertise, as well as his familiarity with the rules and regulations of the Social Security disability program, but also considered that Dr. Armour based his findings on a one-time consultation, and therefore gave the opinion partial weight.  *See Chesser v. Berryhill*, 858 F.3d 1161, 1165 (8th Cir. 2017) (ALJ may credit a one-time consultant's opinion over a treating physician when the consultant's opinion is "supported by better or more thorough medical evidence.) .

Accounting for Dr. Armour's findings, the ALJ assessed an RFC limiting plaintiff to "performing simple, routine repetitive tasks in a work environment free of fast paced production requirements, although end of day quotas are acceptable, and simple work-related decisions with few, if any workplace changes."  Addressing Dr. Armour's finding of a severe impairment in the ability to interact socially, the ALJ included an RFC limitation to "job responsibilities [that] do not require public interaction, only casual and infrequent interaction with co-workers with no tandem tasks, and occasional interaction

---

[2] In the decision, the ALJ incorrectly stated that the psychological evaluation was completed on November 1, 2015, instead of 2016.  (Tr. 24.)

- 19 -

with supervisors." Additionally, the ALJ found that plaintiff must "avoid all exposure to operational control of moving machinery and unprotected heights." (Tr. 22-23.)

To the extent plaintiff is suggesting that the ALJ failed to account for all the limitations Dr. Armour assessed, the ALJ neither explicitly nor implicitly rejected the portion of Dr. Armour's opinion that plaintiff claims he rejected. Among other restrictions, the ALJ's RFC limited plaintiff to "simple work-related decisions with few, if any workplace changes" and "job responsibilities [that] do not require public interaction, only casual and infrequent interaction with co-workers with no tandem tasks, and occasional interaction with supervisors," among other restrictions. (Tr. 22-23). This Court concludes the ALJ reasonably assigned Dr. Armour's opinion partial weight and accounted for the limitations he assessed in the RFC.

Second, the ALJ properly considered the opinion of state agency psychological consultant Dr. Watson. (Tr. 24, 69-74.) Based on a review of the evidence, Dr. Watson opined that plaintiff retained the ability to understand, remember, and execute simple work instructions; work with others on a limited contact basis; and adapt to simple work environments within those parameters. (Tr. 24, 74.) Noting Dr. Watson's opinion was based on a review of the entire record available in January 2016, and citing his expertise in mental health and familiarity with the rules and regulations of the Social Security disability program, the ALJ reasonably gave his opinion great weight and accounted for his findings in the RFC. (Tr. 24.) *See Kraus v. Saul*, 988 F.3d 1019, 1025 (8th Cir. 2021) (opinions from state agency medical and psychological consultants may be entitled to greater weight than the opinions of treating or examining sources where better supported by the evidence); Social Security Ruling (SSR) 96-6p, 1996 WL 374180, at *2 ("State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act.").[3]

---

[3] After the ALJ's decision, SSA rescinded SSR 96-6p effective March 27, 2017. <u>See</u> SSR 17-2p, 2017 WL 3928306, at *1.

As to the ALJ's misstatement that Dr. Watson had the opportunity to review Dr. Armour's evaluation--conducted after Dr. Watson's review of the record—this error is harmless in light of the consistency between the two opinions and the ALJ's accounting for both opinions in evaluating plaintiff's impairments and formulating his RFC. *See generally* 20 C.F.R. § 404.1545(a)(3) (requiring the ALJ to base the RFC findings on "all of the relevant medical and other evidence" in the record); *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.)

As to plaintiff's argument that the ALJ erred by finding a marked limitation in concentration, persistence, or pace at Steps Two and Three, whereas Dr. Watson found only a moderate limitation in that area, plaintiff does not explain how any purported inconsistency in finding him *more* limited constitutes prejudicial error. (Tr. 22, 69).[4] In any event, there is no material inconsistency. "Great" weight is not controlling weight, and the ALJ is tasked with evaluating the claimant's RFC based on the record as a whole, rather than relying entirely on a particular physician's opinion or choose between opinions. *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011). Furthermore, the difference between the ALJ's and Dr. Watson's "paragraph" B findings at Steps Two and Three is immaterial in light of the consistent findings in their detailed RFC assessments, which plaintiff does not challenge. (Tr. 22-23, 72-74). SSR 96-8p states:

> the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings . . . .

---

[4] After the ALJ's decision, SSA revised the "paragraph B" criteria for mental impairments considered at Steps Two and Three. See 81 Fed. Reg. 66138-01 (Sept. 26, 2016). The ALJ correctly applied the regulations in effect at the time of the decision.

1996 WL 374184, at *4.

Third, the ALJ properly considered the August 2016 Mental RFC Questionnaire of Dr. Liss. The ALJ found the probative value of Dr. Liss's opinion limited by the "lack of basis or reason for the opinions expressed therein." (Tr. 25.) Dr. Liss's functional assessment indicated that plaintiff was unable to meet competitive standards in all functional areas. In the portion of the form calling for an explanation of his limitations, Dr. Liss cited plaintiff's PTSD with symptoms of isolation and aggression, and a cognitive impairment. He did not provide a narrative explanation elsewhere in the opinion. (Tr. 711-15.) Such deficiency is a valid reason to discount a treating physician's opinion. *See Hilliard v. Saul*, 964 F.3d 759, 762 (8th Cir. 2020) (affirming ALJ that did not give weight to physician assistant's opinion because he completed a checklist with brief commentary). *See also* 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.").

Additionally, the ALJ found Dr. Liss's across-the-board assessment that plaintiff was unable to meet competitive standards in all categories to be at odds with his own treatment notes, which the ALJ believed showed brief routine office visits with little detail and at odds with the opinions expressed. (Tr. 25, 270-72, 437-38, 680). See 20 C.F.R. § 404.1527 (c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). The ALJ also noted that Dr. Liss's treatment notes did not contain any mental status examinations or other evidence of objective assessment. (Tr. 25, 270-72, 437-38, 680). See 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."). Based on Dr. Liss's lack of explanation for his opinion, the absence of support in his own treatment records, and the opinion's inconsistency with the record as a whole, this Court concludes the ALJ properly gave it little weight.

As to plaintiff's argument that Dr. Liss's August 2016 opinion and the June 2014 VA questionnaire provide a great deal of information, neither of these sources explain how plaintiff's PTSD diagnosis translates into specific functional limitations. As to plaintiff's broad assertion that the record as a whole provides support for Dr. Liss's opinion, again however, plaintiff cites no evidence supporting the specific functional limitations Dr. Liss assessed. Instead, he broadly contends that the record evidence documents ongoing PTSD symptoms and medication adjustments, matters that are not in dispute. The ALJ found that the record supported the severe impairment of PTSD with panic attacks, resulting in significant RFC limitations. Plaintiff has the burden to prove his RFC. *See Kraus*, 988 F. 3d at 1024. Here, plaintiff has not shown how the evidence supports the limitations Dr. Liss assessed.

The Court also rejects plaintiff's assertion that the ALJ should have recontacted Dr. Liss to clarify his opinion. The ALJ can make a decision when the evidence is complete and consistent, and if the record is sufficient, the ALJ can make a decision based on the existing record. *See* 20 C.F.R. § 404.1520b. Here, the ALJ had complete evidence of plaintiff's treatment that was not inconsistent, and the evidence was based on medically acceptable diagnostic techniques, i.e., plaintiff was treated by a psychiatrist. *See id*. at § 404.1520b(b). On the other hand, if the evidence is inconsistent, the ALJ looks to the remaining evidence to determine if he can determine whether plaintiff is disabled based on the existing evidence. *See id*. at § 404.1520b(b)(1). The Court notes  plaintiff does not argue that there were additional medical records from this time but that the ALJ should have sought additional medical opinions. In this case the record evidence was sufficient for the ALJ to make a determination. The ALJ discounted the opinion of Dr. Liss because it was not consistent with the record evidence. The ALJ reasonably determined that the record as a whole, including the supporting opinions of Dr. Armour and Dr. Watson, was sufficient to make a determination on disability.

**Evaluation of Plaintiff's Credibility**

Plaintiff next argues the ALJ erred in evaluating his credibility. Defendant counters that the ALJ properly evaluated his symptoms.

The Court concludes the ALJ's credibility determination was justified. Credibility determinations are the province of the ALJ, and as long as "good reasons and substantial evidence" support the ALJ's evaluation of credibility, the reviewing court will defer to his decision. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). An ALJ may decline to credit a claimant's subjective complaints "if the evidence as a whole is inconsistent with the claimant's testimony." *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).

When evaluating the claimant's subjective complaints, the ALJ must consider all the evidence, including objective medical evidence, the claimant's work history, and evidence relating to the *Polaski* factors: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the claimant's pain; (3) precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions. 739 F.2d at 1322.

In his discussion of the evidence and consideration of plaintiff's subjective complaints, the ALJ noted that the record evidence from the VA showed routine office visits, that plaintiff improved with medication, that he declined psychotherapy, and that the record contained no evidence of treatment commensurate with the debilitating degree of impairment alleged. The ALJ also found that despite his allegations of disabling PTSD related to his military service, plaintiff was able to serve in the Army from 1991 to 2011 before retiring, rather than receiving a medical discharge. (Tr. 25.)

Based on the above, this Court concludes the ALJ's findings are supported by substantial evidence and the ALJ properly considered plaintiff's credibility.

## <u>VI.  CONCLUSION</u>

For the reasons set forth above, the Court concludes the ALJ did not err in his decision.  The decision of the Commissioner of Social Security is affirmed.  A separate Judgment Order is issued herewith.


_____**/s/ David D. Noce**_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 6, 2022.